UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

BROOKLYN CENTER FOR INDEPENDENCE OF
THE DISABLED, a nonprofit corporation; TAXIS
FOR ALL CAMPAIGN; DISABLED IN ACTION
OF METROPOLITAN NEW YORK, a nonprofit
organization; VALERIE JOSEPH, an individual; and
GABRIELA AMARI, an individual, on behalf of
themselves and all others similarly situated,

No. 17-cv-6399 (NRB)

**AMENDED COMPLAINT**

Plaintiffs,

-against-

UBER TECHNOLOGIES, INC.,

Defendant.

Plaintiffs Brooklyn Center for Independence of the Disabled ("BCID"), Taxis For All

Campaign ("Taxis For All"), Disabled In Action of Metropolitan New York ("DIA"), Valerie

Joseph, and Gabriela Amari, by their undersigned attorneys, Disability Rights Advocates, file

this class action complaint against Uber Technologies, Inc. ("Uber" or "Defendant"), as follows.

## I.

## INTRODUCTION

1.      This class action lawsuit challenges the pervasive and ongoing discrimination by

Uber Technologies, Inc., as well as its subsidiary and affiliate entities, (collectively "Uber" or

"Defendant") against residents of and visitors to New York City with mobility disabilities who

need and want to use Uber's transportation services, in violation of the New York City Human

Rights Law and the Americans with Disabilities Act.

2.      Uber has demonstrated a total disregard for the needs of people with disabilities in

the provision of its transportation services and the anti-discrimination laws of New York City

and the United States.

3.      Approximately 58,000 vehicles currently provide Uber transportation services in New York City.  Yet, even after years of outcry from the disability community for accessibility, over ninety-nine and nine tenths of a percent (99.9%) of these vehicles are still unusable by riders who need wheelchair-accessible vehicles.  The observed result is predictable:  When someone who needs a wheelchair-accessible vehicle tries to use Uber, either no vehicle at all is available or the wait time is materially longer than for non-accessible Uber service.

4.      Having grown rapidly since it began operating in New York in 2011, Uber provides hundreds of thousands of rides a day in New York City, but for riders who need wheelchair-accessible vehicles, it provides vastly inferior service, or in many cases, no service at all.

5.      Uber purports to have some accessible vehicles in its fleet, but passengers attempting to use Uber's accessible service face extended wait times, or are still denied access to the service altogether, demonstrating that the new service is nothing more than window-dressing, designed to avoid government regulation and legal requirements.

6.      Uber, which has a valuation of over $50 billion, has no excuse, other than its deliberate corporate decision to neglect people with disabilities who use wheelchairs, including many elderly people, for maintaining such an overwhelmingly inaccessible fleet.

7.      Uber could be an especially crucial transportation option for people with disabilities because other transportation options in the City also have significant barriers to access.  For example, the subway system, the City's quickest, most important travel option, is largely unusable by people with disabilities as almost 80% of its stations are inaccessible for anyone who cannot use stairs.

8.      Even if the subways were completely accessible, the subway system does not extend to many New York City neighborhoods the way Uber does.  New York City's bus system is even more limited, especially after major service cuts that have occurred over the last decade, and is an agonizingly slow and largely inefficient means of travel overall.  New York City's paratransit system has been widely criticized as ineffective, and provides users with a dramatically more limited level of service than is available to riders able to use subways and buses.

9.      On-demand transportation services can fill the transportation gaps for riders with disabilities, if they are operated in a non-discriminatory way.  For example, as a result of prior court action, New York City has agreed to ensure that 50% of all yellow medallion taxi cabs will be accessible by the end of 2020.  Yet, Uber's attempt to skirt the law, by maintenance of a fleet that is 99.9% inaccessible, substantially undermines the benefits of that taxi cab settlement. Many drivers have abandoned medallion taxi cab jobs, turning to Uber, which is skirting the law, for employment instead.

10.      Transportation is crucial for freedom and independence.  When Uber denies equal service to riders needing wheelchair-accessible vehicles, it results in real harm by interfering with the ability to work, attend school, shop for groceries, receive medical care, enjoy entertainment and cultural events, maintain family and social ties, and otherwise participate fully in the life of the city.

11.      Denied equal service, riders who use wheelchairs are forced to arrange alternate transportation that may be more costly, less convenient, and/or less comfortable, or they may forgo activities that require travel altogether which can lead to isolation and seclusion.

12.     Uber's failure to provide fair and equal access to its services violates the City's anti-discrimination law meant to "eliminate and prevent discrimination from playing any role in actions relating to . . . public accommodations," and the Americans with Disabilities Act.

13.     Plaintiffs bring this complaint on behalf of themselves and other similarly situated people with mobility disabilities, who require the use of wheelchair-accessible vehicles.

## II.

## JURISDICTION AND VENUE

14.     This is an action for declaratory and injunctive relief brought pursuant to the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*., and  Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"). The Court has power to issue such relief *inter alia* pursuant to 28 U.S.C. §§ 2201 and 2202..

15.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 for claims arising under the ADA, and supplemental jurisdiction over the New York City Human Rights Law claims pursuant to 28 U.S.C. § 1367.

16.     This Court further has subject matter jurisdiction under 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000.

17.     Defendant has alleged that the Court further has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d) and 1453(b). (Notice of Removal, 8/22/17, Doc. 1, ¶ 1)

18.     Following the commencement of this action, a copy of this Complaint was served both on the New York City Commission for Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

19.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred and continue to occur within this district.

## III.

## PROCEDURAL HISTORY

20.     Plaintiffs commenced this action in the Supreme Court, New York County, on July 18, 2017.  Defendant filed the Notice of Removal on August 22, 2017.

21.     Defendant alleged that this court had subject matter jurisdiction under the Class Action Fairness Act, because the putative class has more than 100 members and the amount in controversy allegedly exceeds $5 million.[1]

22.     After three extensions of time to respond to the complaint, Defendant filed a motion to dismiss the complaint on October 18, 2017.  The Court denied the motion on October 19, 2017, and granted Plaintiffs leave to amend by November 2, 2017.

23.     A blackline version showing changes to the original Complaint is attached as Exhibit 1.

## IV.

## PARTIES

### A.     Plaintiffs

---

[1] Plaintiffs dispute the basis alleged for Defendant's amount in controversy calculation.  If one credits Uber's own statements about the demand for accessible transportation and the current status of its accessible service, *see* Memorandum of Law in Support of Defendants' Motion to Dismiss (Doc. 23, filed 10/18/17), it is implausible that Uber will need to spend the hundreds of millions of dollars it references to ensure that it is providing equivalent service to passengers who require accessible transportation. The value to plaintiffs of the relief requested is substantial but intangible.  Plaintiffs submit this Amended Complaint, adding a federal claim under the ADA and removing the individual defendant, to avoid unnecessary motion practice while ensuring clarity as to subject matter jurisdiction in this Court.

24.     Plaintiff Brooklyn Center for Independence of the Disabled ("BCID") is a consumer-based, not-for-profit independent living center that provides services and advocacy intended to foster independence for persons with disabilities in Brooklyn and throughout New York City.  The majority of BCID's board members and staff are persons with disabilities, including mobility-related disabilities.

25.     Each year, BCID serves approximately 1,400-1,700 persons with disabilities. Moreover, BCID has approximately 50 support-group members and peer counselors; many have mobility disabilities that require the use of wheelchairs, walkers, scooters or other assistive devices.

26.     BCID's mission is to ensure full integration, independence and equal opportunity for all people with disabilities.  BCID strives to accomplish this goal by removing barriers to the full and equal participation in the social, economic, cultural, and civic life of the community for all people with disabilities.  A key component of this mission is ensuring that people with mobility disabilities can use transportation services in New York City.  In recent decades, BCID has worked to ensure that transportation options are available to persons with disabilities.  The continued inaccessibility of Uber transportation is thus an issue of concern for BCID.

27.     BCID has expended time and resources on advocacy work to improve access, including transportation options, for disabled residents of New York City.  BCID has been monitoring the growth of ride-sharing services, and engaging in advocacy work to encourage ride-sharing services to provide wheelchair accessible vehicles.  This work has included advocacy regarding legislative proposals to require Uber and similar services to provide accessible service statewide, and organizing, advocacy, and education efforts regarding proposals to require the provision of accessible for-hire vehicle services in New York City.

BCID also has played a central role in several recent campaigns and lawsuits intended to increase accessibility in transportation for New Yorkers and others with disabilities. For example, BCID has been an integral member of the Taxis For All Campaign, a coalition that has worked since 1996 for wheelchair-accessible taxis and livery services. BCID also is a plaintiff in a federal lawsuit and a state lawsuit, which separately charge that the New York City subways are largely inaccessible because there are elevators in fewer than 25% of the stations and that the few elevators in the subways are poorly maintained, making traveling by subway almost impossible for wheelchair users. BCID also is a lead group in the Access-A-Ride Reform Group (AARRG!), which is working to improve and reform New York City Transit's abysmal paratransit service.

28.    BCID itself has been injured as a direct result of Defendant's actions and omissions as discussed herein. BCID's interests are adversely affected because it must expend resources, as it is doing in this lawsuit and has done in its organizing and advocacy efforts, advocating for its constituents who are harmed by Defendants' policies and practices. BCID has suffered injury in the form of diversion of these resources and frustration of its mission.

29.    In addition, one or more members of BCID have been injured as a direct result of Defendant's discriminatory policies and practices and would have standing to sue in their own right. For example, approximately a third of BCID's full- and part-time employees use motorized wheelchairs and require accessible transportation. At least two of those employees, Valerie Joseph and Gabriela Amari, would like to use Uber's services, but have been deterred from doing so by the lack of equivalent service. In addition, about a third of the participants in BCID peer support groups and peer counselor programs use wheelchairs. BCID can bring this action on behalf of its members because the interests at stake are germane to BCID's purpose

and only injunctive and declaratory relief are requested, which do not require the participation of

individual members in the lawsuit.

30.     Plaintiff Disabled In Action ("DIA"), founded in 1970, is a nonprofit civil rights

membership organization committed to ending discrimination against people with all disabilities.

31.     DIA consists primarily of, and is directed by, people with disabilities.  DIA's

members include residents with disabilities throughout New York City.  Approximately one half

of DIA's fifteen-member board use power wheelchairs for mobility and thus require accessible

transportation. Many of DIA's members are having difficulty using or are completely unable to

use Uber's transportation service because, by virtue of the acts and/or omissions of Defendant

alleged herein, they cannot effectively obtain an accessible Uber vehicle.

32.     DIA's objectives include promoting the ability of persons with disabilities to live

independently.  To that end, DIA works for the passage of laws that affirm and defend the rights

of people with disabilities.  In addition, DIA works to educate government officials, community

leaders, and the general public about disability issues and plans and participates in public

demonstrations to draw attention to these issues.

33.     DIA, along with BCID and Taxis for All, have expended and continues to expend

substantial time and resources on advocacy work concerning policies and practices that affect

disabled residents of New York City.  For instance, DIA advocated for passage of Local Law 58:

the 1987 NYC Building Code amendment requiring that all commercial and residential buildings

include accessible features in common areas and dwelling units when newly constructed or

renovated.  DIA also has participated in legal actions against New York City for its holding a

public Town Hall meeting at an inaccessible site, against the federal government for

noncompliance with the ADA at fifteen federal courthouses in New York City, against the New

York City Human Rights Commission for failure to provide written material in alternative formats, and against the New York City MTA for not operating Access-A-Ride in compliance with the ADA.

34.    DIA has expended time and resources on advocacy work to improve transportation options for disabled residents of New York City.  DIA was deeply involved in the struggle to gain greater accessibility in taxi services in New York City, through its participation as a plaintiff in *Taxis for All Campaign v. New York City Taxi and Limousine Commission*, which resulted in New York City committing to make 50% of its yellow taxi fleet accessible by 2020.

35.    DIA has spent resources attempting to maintain this level of accessibility, which is being seriously eroded by Uber.  DIA members frequently attend meetings of the New York City Council to advocate for transportation access.  DIA also expends time helping DIA members with their difficulties acquiring accessible transportation.  Further, DIA has been involved with organizing, education, and advocacy surrounding current proposals to require that Uber and other for-hire vehicle providers in New York City provide accessible transportation.  These efforts have included organizing attendees and assistance with preparing testimony at the September 28, 2017 Taxi and Limousine Commission  public hearing regarding these proposals.

36.    DIA itself has been injured as a direct result of Defendant's actions and omissions as discussed herein.  DIA's interests are adversely affected because it must expend resources, as it is doing in this lawsuit, advocating for its constituents who are harmed by Defendant's policies and practices.  DIA has suffered injury in the form of diversion of these resources and frustration of its mission.

37.    In addition, one or more members of DIA have been injured as a direct result of Defendant's discriminatory policies and practices and would have standing to sue in their own right.  DIA can bring this action on behalf of its members because the interests at stake are germane to DIA's purpose and only injunctive and declaratory relief are requested, which do not require the participation of individual members in the lawsuit.

38.    Plaintiff the Taxis For All Campaign ("Taxis For All") is a coalition of disability rights organizations and individuals in New York City dedicated to the goal of increasing access to wheelchair accessible taxis, liveries, and other for-hire vehicles.  The member groups of the Taxis For All Campaign include Bronx Independent Living Services, Brooklyn Center for Independence of the Disabled, Center for Independence of the Disabled in New York, Disabilities Network of New York City, Disabled in Action of Metropolitan New York, 504 Democratic Club, Harlem Independent Living Center, and United Spinal Association.

39.    Taxis For All was founded in 1996 in New York City by disability rights advocates in New York City who were frustrated by the inaccessibility of New York City taxis and other for-hire vehicles and the inability of people with disabilities to get around in the city. For the past 21 years Taxis For All has and continues to expend substantial time and resources on advocacy work concerning transportation difficulties faced by people with disabilities.  Their efforts include lobbying for legislative solutions, raising awareness, and organizing roll-in demonstrations at taxi stands to protest the inaccessibility of New York City taxis.  Taxis For All eventually became the lead plaintiff in *Taxis For All Campaign v. New York City Taxi and Limousine Commission* intended to increase the supply of wheelchair accessible transportation options in New York.

40.     Taxis For All itself has been injured as a direct result of Defendant's actions and omissions as alleged herein.  Taxis For All's interests are adversely affected because it must expend resources, as it is doing in this lawsuit, advocating for its constituents who are harmed by Defendant's discriminatory policies and practices.

41.     Plaintiff Valerie Joseph is an Access-a-Ride Advocate at BCID and currently resides in Queens Village, Queens.  Plaintiff Joseph has a mobility disability that substantially limits the major life activity of walking.  Plaintiff Joseph typically uses a motorized wheelchair to travel.  If Plaintiff Joseph wants to travel by car or van, the vehicle must be equipped with a ramp or lift to accommodate her wheelchair.

42.     Plaintiff Joseph would like to use and has been deterred from using Uber's transportation services because she is aware that Uber discriminates against people with mobility disabilities in its transportation services.

43.     Plaintiff Joseph plans to and will attempt to use the Uber application ("app") and Defendant's programs, services, and accommodations in the future, should those programs, services, facilities, and accommodations become wheelchair-accessible.

44.     Plaintiff Joseph presently fears that she will encounter the mobility-related barriers and unequal services which exist within Defendant's transportation system.

45.     Plaintiff Joseph continues to desire to utilize the Uber app and transportation service, but will continue to be deterred until the violations detailed herein are removed.

46.     Plaintiff Gabriela Amari is a manager and Peer Support Specialist at BCID and currently resides in Kensington, Brooklyn.  Plaintiff Amari has a mobility disability that substantially limits the major life activity of walking.  Plaintiff Amari typically uses a motorized

wheelchair to travel.  If Plaintiff Amari wants to travel by car or van, the vehicle must be equipped with a ramp or lift to accommodate her wheelchair.

47.     Plaintiff Amari would like to use and has been deterred from using Uber's transportation services because she is aware that Uber discriminates against people with mobility disabilities in its transportation services.

48.     Plaintiff Amari plans to and will attempt to use the Uber app and Defendant's programs, services, and accommodations in the future, should those programs, services, facilities, and accommodations become wheelchair-accessible.

49.     Plaintiff Amari presently fears that she will encounter the mobility-related barriers and unequal services which exist within Defendant's transportation system.

50.     Plaintiff Amari continues to desire to utilize the Uber app and transportation service, but will continue to be deterred until the violations detailed herein are removed.

**B.     Defendant**

51.     Defendant Uber Technologies, Inc. ("Uber") is a for-profit corporation that provides for-hire transportation in New York City.  Uber is registered in Delaware and headquartered in California.

**V.**

**CLASS ACTION ALLEGATIONS**

52.     The named Plaintiffs bring this action for injunctive and declaratory relief on their own behalf, on behalf of their members, and on behalf of all persons similarly situated and all residents in and visitors to New York City with mobility disabilities who have been and are currently being discriminated against by Defendant's actions and omissions as alleged herein.

53.     The class the named Plaintiffs seek to represent consists of all people with mobility disabilities who are residents in or visitors to New York City, who require wheelchair-

accessible vehicles for vehicular transportation, and who want to but have been deterred from signing up for Uber's transportation network because it does not provide equal service to people who require wheelchair-accessible vehicles.

54.     The persons in the class are so numerous that joinder of all members of the class is impracticable and the disposition of their claims in a class action is a benefit to the parties and to the Court.

55.     Data from the United States Census American Community Survey conducted in 2014 indicates that more than 500,000 non-institutionalized New York City residents have a mobility-related disability.  Hundreds of thousands of people with disabilities, moreover, visit the City each year.

56.     There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented, in that Plaintiffs' members and individuals in the class will continue to be denied access to Uber's transportation service because of its lack of accessible vehicles.

57.     Common questions of law and fact predominate, including the question of whether Defendant's failure to provide accessible vehicles discriminates against individuals with mobility disabilities in violation of the New York City Human Rights Law and the Americans with Disabilities Act.

58.     The claims of the named Plaintiffs, or their members, are typical and are not in conflict with the interests of the class as a whole.  Defendant's course of conduct and violation of the law as alleged herein has caused Plaintiffs and class members to be deprived of their rights under the New York City Human Rights Law and the Americans with Disabilities Act. Therefore, all class members will suffer the same or similar injuries for  the purposes of the

injunctive and declaratory relief sought. Plaintiffs' claims are thereby representative of and co-extensive with the claims of the class.

59.    The named Plaintiffs are adequate class representatives because they and/or their members do not have any conflicts of interest with other class members, and will prosecute the case vigorously on behalf of the class.

60.    The attorneys representing the class are experienced both in disability law and in class action institutional litigation.  Counsel representing the plaintiff class is qualified to fully prosecute this litigation and possesses adequate resources to see this matter through to resolution.  Plaintiffs will fairly and adequately represent and protect the interests of the class.

61.    Defendant has acted and failed to act on grounds generally applicable to the class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

## VI.

## FACTUAL ALLEGATIONS

## THE UBER SERVICE

62.    Uber provides transportation services to members of the general public in all five boroughs of New York City.

63.    Uber provides different classes of transportation service.  In New York City, Uber offers UberX, a cost-effective car service option, UberPOOL, a carpooling product, UberXL and UberSUV, a car service limited to large vehicles, UberBLACK, a premium car service product, UberCARSEAT, a car service option offering car seats, and UberWAV, a car service option offering wheelchair-accessible vehicles.

64.     All of these transportation options operate in a similar way: Uber uses its mobile apps to connect riders to available drivers, to facilitate and manage transportation, and to collect payments.

65.     Uber has developed mobile software apps for Apple iPhones, Android phones, and Windows phones that customers use to request transportation for themselves and/or their guests.

66.     To use Uber, individuals must either (1) create a user account, and provide Uber with their phone number, credit card information, and email address, or (2) travel as a guest of an individual with an Uber customer account.

67.     To use one of the Uber transportation services, customers select which class of vehicle they want and then submit a request through the app for a vehicle, either for their own use or other passengers.

68.     Once Uber identifies a close, available vehicle and matches the customer with a driver, Uber notifies the requester either by text message or through its smart phone app that a driver has been assigned.  The notification includes the driver's name, customer rating, phone number, vehicle license plate number, make and model of the vehicle, and the driver's estimated time of arrival.  Uber's mobile app then allows the requesting customer to track the vehicle's location as the driver navigates to the requesting customer's identified pick-up address.

69.     Requesting customers may also submit the desired trip destination through Uber's app and the app will provide a fare estimate.  Customers may also contact the driver through the app, and drivers may contact their assigned customer through the app.  The Uber app notifies the requesting customer once their vehicle has arrived.  The requester or any other associated passengers may then board the vehicle.

70.    A vehicle using the Uber platform, for all classes except for UberPOOL, is able to transport a single passenger or a group of passengers traveling together up to the safe capacity of the requested vehicle.

71.    If the requesting customer submitted the destination address, the app will supply the driver with turn-by-turn directions to the desired destination.  If the requesting customer did not enter the destination into Uber's app, the passenger(s) provides the driver with the desired destination.  The driver then begins the trip in the Uber software app and proceeds to the desired destination.

72.    When the vehicle arrives at the desired destination, the driver ends the trip in the Uber smart phone app.  Uber then charges the customer's credit card for the trip fare.  No cash is exchanged.  Uber allows the rider and the driver to provide ratings of each other in the app after the ride has concluded.

**UBER'S TIGHT CONTROL OVER ITS DRIVERS AND PROCEDURES**

73.    Uber exercises very significant, comprehensive and detailed control over Uber transportation services and Uber drivers.

74.    Uber decides who may provide its Uber transportation services.

75.    Individuals who wish to drive in the Uber transportation service must complete various forms and undergo a driving record check, present their driver's license, vehicle registration, and driver's insurance.  In addition, before Uber drivers may use a vehicle to provide Uber services in New York City, the driver must obtain a Taxi & Limousine Commission (TLC) commercial license.

76.    Uber exercises exclusive control over termination of Uber drivers.  Uber routinely terminates drivers for several reasons, including for poor ratings from customers or discriminatorily refusing to provide service to customers.

77.     Uber controls which trip requests it transmits to each of its drivers.

78.     Uber requires all drivers to provide Uber with information about the make, model, and age of the vehicle that they will drive with while providing Uber transportation.

79.     Uber exercises its control to require that drivers follow the law and that their vehicles and vehicle equipment meet legal requirements.  Its web page lists "vehicle requirements" in New York City.  *See* Uber, *Vehicle requirements New York City*, https://www.uber.com/drive/new-york/get-started/vehicle-requirements/.  Uber also requires vehicles to have passed a Taxi and Limousine Commission inspection, which requires specific equipment in vehicles, such as seatbelts. *See* New York City Taxi and Limousine Commission, *For-Hire Vehicle Owners: What you should expect at your TLC inspection*, http://www.nyc.gov/html/tlc/downloads/pdf/fhv_inspection_chklst.pdf.

80.     Uber sets standards for which makes, models, and age of vehicle can be driven in the Uber network.  These standards are detailed.  Uber-authorized vehicles include a number of vans.  Models must be at least 2006 or later, and in many cases Uber requires much more recent models.  *See* Uber, *List of eligible vehicles New York City*, https://www.uber.com/drive/new-york/get-started/eligible-vehicles/.

81.     Uber also sets standards for which makes, models, and age of vehicle can be driven for each class of Uber vehicle, such as UberSUV, UberXL, and UberBLACK.

82.     Uber also exercises control over the vehicles driven for its service through partnerships with dealerships that offer rental and lease-to-own options to assist its drivers in obtaining vehicles with which to provide Uber transportation services.

83.     Uber even exercises control over the engineering and manufacture of vehicles for its service.  Uber touts its "Advanced Technology Group," a team that includes hardware and

product design engineers.  Its goals include "transforming the way the world moves" and "developing long-term technologies that advance Uber's mission of bringing safe, reliable transportation to everyone, everywhere."   This work includes self-driving cars and trucks, but not wheelchair-accessible vehicles.  *See* Uber, *Advanced Technologies Group*, https://www.uber.com/info/atg/.

84.     Uber requires that Uber drivers refrain from smoking while providing Uber services.

85.     Uber requires that its drivers meet or exceed the estimated time-of-arrival that Uber generates and provides to each customer.

86.     Uber prohibits its drivers from discriminating against people based on race, religion, national origin, disability, sexual orientation, sex, marital status, gender identity, age or any other characteristic protected under applicable federal or state law.

87.     In addition, Uber instructs Uber drivers that the share of trip requests that they accept through Uber's app should be consistently high, and that Uber drivers may not accept street hails from potential passengers.

88.     Furthermore, Uber issues training and directives concerning other requirements to Uber drivers.

89.     Uber also closely monitors its drivers.

90.     Uber records many details about the demand-responsive transportation services that its drivers provide, including for each trip: (1) the pickup location, (2) the time of pickup, (3) the drop off location, (4) the time of drop off, (5) the distance traveled, (6) the trip route, (7) the trip duration, and (8) the customer's identity.

91.     Uber employees who supervise drivers have easy access to this data.

92.     Uber also monitors its Uber drivers' performance by asking customers for written feedback, including a driver "rating" of between 1 and 5, via the app, after every ride that a driver provides, and Uber routinely follows up with customers who express dissatisfaction.

93.     Furthermore, Uber regularly terminates or suspends Uber drivers whose average customer rating falls below a certain threshold.

94.     In addition, Uber maintains general commercial liability insurance to cover claims concerning incidents that occur while drivers are providing Uber transportation services.

95.     Uber tightly controls payment for its Uber transportation services.

## UBER CONTROLS WHO USES ITS SERVICES AND HOW IT IS USED

96.     Uber also controls who may use Uber services.

97.     Uber makes its services available only to members of the public who have a credit card and a smart phone that can run one of its mobile applications, who create an Uber account, and who request a ride through Uber's mobile app, or to individuals traveling with these Uber customers or in vehicles ordered by these Uber customers.

98.     Riders cannot access Uber services by physically hailing an Uber vehicle on the street.

99.     Customers do not pay Uber drivers directly.

100.    Uber automatically charges a customer's credit card after he or she arrives at the desired destination.

101.    Uber has exclusive control over the fares that customers pay and the compensation that Uber drivers receive.

102.    Fares for Uber's transportation services are based on the duration and distance of each trip and other factors such as demand at the time and place of the ride, as determined by Uber's algorithms.

103.    Uber keeps a percentage of each fare.

104.    Thus, Uber compensates its Uber drivers based on the duration and distance of the trips that they provide to customers.  Payments are not transferred directly from customers to drivers; rather, Uber collects and holds customer payments, deducts fees, and then later transfers money to drivers.

105.    Customers who dispute the fare for a particular trip must contact Uber customer service representatives to request an adjustment to their fares.

106.    Thus, Uber closely monitors and controls interactions between Uber drivers and customers.

107.    In New York City, Uber drivers provide the range of Uber transportation services to the public in a fleet of more than 58,000 vehicles.

108.    This massive fleet allows members of the public to quickly and efficiently obtain a ride through the various Uber transportation services.

109.    Customers can open the Uber app on their smart phone, at any time of day and in any part of New York City, and request transportation service from Uber.

110.    Customers choose which class of Uber service they want.  Customers can choose Uber services that provide private rides in luxury vehicles, standard vehicles, large vehicles, vehicles equipped with car seats.  Customers also can choose to use a shared Uber service, through which they carpool with strangers for a reduced fare.

111.    Customers select the class of Uber service they want, and then request a vehicle.

112.    Uber's proprietary algorithm matches the rider with a nearby driver who is providing service for that vehicle class.  For example, a customer might request an UberSUV, in which case he will be matched with a nearby SUV driver.

113.    After the Uber app matches the rider and driver, the driver picks up the rider and transports the rider to his destination.

114.    Uber exerts control over how many vehicles provide its service at a given time through carefully calibrated adjustments in its service's financial incentives.  For example, Uber's "surge" pricing imposes additional charges during high-demand times to "make sure those who need a ride can get one."  *See* Uber Help, *What is surge?*, https://help.uber.com/h/e9375d5e-917b-4bc5-8142-23b89a440eec.

## DISCRIMINATION BECAUSE OF ABSENCE OF UBER WHEELCHAIR ACCESSIBLE VEHICLES

115.    While Uber in New York City offers a range of services, only vehicles in its UberWAV service are capable of providing transportation to riders who require wheelchair-accessible vehicles.

116.    With an Uber fleet of approximately 58,000 vehicles in New York City, fewer than 100 vehicles provide the UberWAV service.[2]

117.    This small number of accessible vehicles in the Uber fleet, a fraction of a percent, is not sufficient to provide equivalent or adequate service to wheelchair users regardless of the technology used.

118.    Moreover, wheelchair accessible vehicles in Uber's New York City fleet are not reserved for or used exclusively by mobility disabled passengers; they are available to and used by non-disabled passengers through UberX and other vehicle classes.  Particularly at peak

---

[2] *See* NYC Taxi and Limousine Commission, NYC Open Data, "Wheelchair Accessible for-Hire Vehicles" http://www.nyc.gov/html/tlc/html/about/statistics.shtml (last visited July 17, 2017) (listing 61 wheelchair accessible for-hire vehicles affiliated with Uber bases); NYC Taxi and Limousine Commission, NYC Open Data, "For-Hire Vehicles (FHV) Active and Inactive Vehicles" https://data.cityofnewyork.us/Transportation/For-Hire-Vehicles-FHV-Active-and-Inactive-Vehicles/8wbx-tsch/data (listing 58,093 vehicles affiliated with Uber bases) (last visited July 17, 2017).

demand hours, even the relatively few accessible vehicles in Uber's fleet may be unavailable to riders who use wheelchairs because those vehicles are being used by non-disabled people.

119.    As a result, Uber riders who require wheelchair-accessible vehicles regularly face significantly longer wait times to get a vehicle than individuals who do not require wheelchair-accessible vehicles.

120.    Uber riders who require wheelchair-accessible vehicles also find that Uber service is not available at all at certain times or in certain locations.

121.    Uber riders who require wheelchair-accessible vehicles are also denied access to all but one of Uber's transportation classes.  Riders who use wheelchairs requiring lifts or ramps can only travel in UberWAV, not an UberPOOL carpool, not a deluxe vehicle such as UberBLACK, and not a vehicle with a car seat such as UberCARSEAT.

122.    Uber has been sued in cities around the United States for its violation of disability laws by failing to provide wheelchair-accessible service, yet has continued its policy of denying that service.  *See*, *e.g.*, *Equal Rights Center v. Uber Technologies, Inc.*, No. 17-cv-01272 (D.D.C. filed 6/28/2017), *Access Living of Metropolitan Chicago v. Uber Technologies, Inc.*, No. 16-cv-09690 (N.D. Ill. Filed 10/13/2016).

### DENIAL OF UBER'S DESIRABLE AND UNIQUE SPECIAL FEATURES

123.    Denial of accessible vehicles also denies people who use wheelchairs the ability and right to utilize and enjoy the attractive features that have made Uber service so popular and sought after.  These services are not available with yellow taxi cab service.

124.    These features include the ability to pay for a ride without using cash or presenting a credit card because Uber charges the customer's previously entered credit card instantly when the vehicle reaches the rider's destination.

125.    Another key Uber feature is the ability to call for a ride anyplace in New York City without having to identify a particular company that serves the neighborhood the customer is in. Yellow medallion taxis and neighborhood livery services often serve limited geographical areas, but Uber is available across the city and, in fact, across the region.

126.    Uber offers door-to-door service across the city and region and has precise locator technology. This is unlike yellow medallion taxis which typically must be hailed on major thoroughfares or livery vehicles, which typically must be called via telephone with an address specified.

127.    A person with an Uber account who travels to New York City from another country may order a vehicle using the Uber app without having to worry about different currencies or languages.

128.    Uber vehicles typically are higher-end vehicles than those used as medallion yellow or livery vehicles, giving the rider the feeling of traveling in an exclusive private vehicle rather than a typical taxi.

## INACCESSIBILITY RESULTS IN REAL HARM

129.    When Uber fails to provide full and equal service to riders who require wheelchair-accessible vehicles, these riders experience several harms.

130.    At times, because of delays or total lack of wheelchair-accessible vehicle availability, people who use wheelchairs must arrange alternate transportation that is sometimes more costly and significantly less convenient.

131.    People who use wheelchairs also face the denigrating experience of being denied a basic service that is available to all other paying customers.

132.    Even when an UberWAV vehicle is technically available, because so few exist, there are typically frequent and lengthy delays. As such, people who use wheelchairs and use

UberWAV must contend with missed appointments, being late for events, and other stress and inconvenience.

133.    Due to distances between destinations and the severe limitations of public transportation and paratransit, many persons with disabilities must use private transportation services to travel from one place to another.

134.    When people do not have ready access to transportation, they suffer significant social isolation and other harms.

135.    Uber provides a valuable transportation alternative to millions of New Yorkers, allowing people to more easily travel to work, social events, community engagements, appointments, and other destinations, yet Uber excludes people with mobility disabilities from these same benefits of its convenient transportation.

## EXPONENTIAL GROWTH OF UBER HARMING TAXIS

136.    Due to the public's widespread adoption of smart phones, Uber is quickly supplanting traditional taxi companies and becoming the public's primary option for on-demand transportation services.  The *New York Times* recently reported that the number of Uber rides in New York City exceeded the number of taxi rides.[3]

137.    App-based ride services, of which Uber is the innovative leader, are growing tremendously.  These services providers, pioneered by Uber, are sometimes referred to as Transportation Network Companies ("TNCs").

---

[3] "Uber, Surging Outside Manhattan, Tops Taxis in New York City," *N.Y. Times*, Oct. 12, 2017, https://www.nytimes.com/2017/10/12/nyregion/uber-taxis-new-york-city.html?_r=0.

138.    TNC ridership in New York City doubled annually over the last three years, to 133 million passengers in 2016.  The fall 2016 ridership averaged 15 million passengers per month, which is more than triple the ridership level of spring of 2015.

139.    Since mid-2016, TNCs have added an average of 7 million passengers per month, compared to the same months in 2015 while yellow cab ridership has been declining by 2 million passengers per month, compared to the same months in 2015.

140.    It is reported that TNCs transported 87% as many passengers as yellow cabs.

141.    From 2013 to 2016, yellow cab ridership fell by 70 million.

## UBER'S DISCRIMINATION HARMS PLAINTIFFS

142.    Members of Plaintiffs BCID, DIA, and Taxis for All and other individuals with mobility disabilities use or wish to use Uber's transportation services.

## EXPERIENCE OF VALERIE JOSEPH

143.    Plaintiff Joseph knows that Uber has very few wheelchair-accessible vehicles in its service, and that people who need wheelchair-accessible vehicles often cannot get service from an Uber vehicle at all, or frequently have lengthy wait times far longer than for non-accessible vehicles.

144.    Plaintiff Joseph is aware of the discrimination in Uber's platform because she has heard from friends and colleagues who have mobility disabilities and have witnessed Uber's failure to provide equivalent, non-discriminatory service.

145.    Because Uber does not provide equal service to people with mobility disabilities who need wheelchair-accessible vehicles, such as Plaintiff Joseph, she has been deterred from trying to access Uber's transportation services.

146.    Plaintiff Joseph commutes from her home in Queens to work in Brooklyn, and frequently travels to meetings and events during the workday.  Public transit options are limited

in her neighborhood, and she is unable to rely on Access-a-Ride when she does not have sufficient advance notice to reserve an Access-a-Ride trip or enough time for its erratic routing.

147.    Plaintiff Joseph has not signed up for an account with Uber.

148.    Plaintiff Joseph is aware that Uber provides affordable, efficient, and convenient transportation services to New Yorkers who do not use wheelchairs, and she would use Uber if equal services and benefits were available to her and other individuals with mobility disabilities who require wheelchair-accessible vehicles.

## EXPERIENCE OF GABRIELA AMARI

149.    Plaintiff Amari knows that Uber has very few wheelchair-accessible vehicles in its service, and that people who need wheelchair-accessible vehicles often cannot get service from an Uber vehicle at all, or frequently have lengthy wait times that are far longer than for non-accessible vehicles.

150.    Plaintiff Amari is aware of the discrimination in Uber's platform, because she has heard from friends and colleagues who have mobility disabilities and have witnessed Uber's failure to provide equivalent, non-discriminatory service.

151.    Plaintiff Amari attended an information fair at which representatives from Uber were present.  She asked a representative if Uber had accessible vehicles available and was told the company was working on it.  She later heard that Uber offered some accessible service.  Plaintiff Amari was interested in the prospect of having Uber as a reliable, accessible transit option.  She later spoke to friends who use wheelchairs and was disappointed to hear that Uber's accessible service was extremely limited, and often unavailable.  As a result, she was deterred from downloading the Uber app to try the service because she was told it would not be a reliable transit option.

152.    Plaintiff Amari has continued to hear reports from colleagues about the insufficiency of Uber's wheelchair-accessible services and its long, unreliable wait times.

153.    Because Uber does not provide equal service to people with mobility disabilities who need wheelchair-accessible vehicles, such as Plaintiff Amari, she has been deterred from trying to access Uber's transportation services.

154.    Plaintiff Amari has not signed up for an account with Uber.

155.    Plaintiff Amari would like to use Uber transportation services if Uber provides equivalent access to her and other individuals with mobility disabilities who require wheelchair-accessible vehicles.  She would be very interested in having the option of using Uber's services if those services were as reliable, affordable, and convenient as they currently are for riders who do not use wheelchairs.

156.    Plaintiff Amari would particularly want to use Uber in situations when it is vital that she can get a ride quickly and reliably.  This would include when she needs to go travel to an important medical appointment and Access-a-Ride does not arrive for her pick-up time, when she needs to travel to the emergency room but does not require an ambulance, or when one of her pets has an emergency and needs to be brought to the animal hospital.

## EXPERIENCE OF JEAN RYAN

157.    Jean Ryan is the Vice-President of Public Affairs for DIA and is active in Taxis For All.  Ms. Ryan uses a wheelchair and wants to use wheelchair-accessible Uber transportation.  Ms. Ryan attempted to use UberWAV on multiple occasions in the past, but was never able to use the service.

158.    Ms. Ryan has had numerous negative experiences trying to use UberWAV, experiencing significant delays as well as unavailability of wheelchair-accessible service.

159.    For example, in September of 2015, Ms. Ryan requested an UberWAV vehicle but delays were so lengthy she cancelled the ride.  Ms. Ryan was at a meeting in Midtown Manhattan with Joseph G. Rappaport, who at the time served as an advisor to Taxis for All, and requested an UberWAV.  Uber matched her with a driver around 2:10pm, and the app stated that the driver would arrive 13-14 minutes later.  At 2:20pm, the app stated that the driver would arrive in 10 minutes.  At 2:35pm, the app said that the driver would arrive in 14 minutes.  At 2:38 the app said that the driver would arrive in 18 minutes.  At 2:40 Ms. Ryan cancelled the ride, after having waited approximately 30 minutes.

160.    Ms. Ryan again attempted to secure UberWAV transportation in November of 2015.  She tried to call an UberWAV five times from Midtown Manhattan, but none were available.

161.    Ms. Ryan also tried to use UberWAV transportation and found it unavailable in October of 2016.  Ms. Ryan wanted to travel to Park Slope, Brooklyn for an arts event.  By the time she heard about the arts event, it was too late for her to call Access-a-Ride, which requires pre-reservations.  Ms. Ryan decided to try UberWAV again, and checked the Uber app. She found that there were no UberWAV vehicles available.  Because she could not use Uber, Ms. Ryan traveled by local bus, which took a much longer time than a ride in an Uber vehicle would have taken.

162.    In July 2017, Ms. Ryan used her Uber app to see if UberWAV wait times had become more comparable to UberX wait times since she had last tried to use the service.  She checked comparative wait times on six occasions on July 11 and 12, 2017, each from locations in Brooklyn.  On all six occasions, the UberX wait time listed in the app was 2 or 3 minutes.  The shortest UberWAV wait time listed was 14 minutes and the longest was 30 minutes.  Further, on

one of the six occasions, UberX listed a wait time of 2 minutes, while UberWAV did not list a

wait time at all, seeming to indicate that no vehicle was available.

163.    Ms. Ryan would use UberWAV if it provided reliable and efficient service

comparable to the service Uber offers to passengers who do not require accessible transit.  She

would use Uber for spontaneous trips, and for travelling from her home in Brooklyn to

Manhattan for social and cultural events.

164.    Because Uber closely controls, monitors, supervises, and manages its drivers and

vehicle fleet, Uber is capable of adopting the policy changes and taking the steps necessary to

ensure that its fleet provides equal access to riders who require wheelchair-accessible vehicles.

## VII.
## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

Denial of Full and Equal Enjoyment in Violation of the New York City Human Rights Law
(N.Y.C. Admin. Code § 8-107(4))

165.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs in this

Complaint.

166.    N.Y.C. Admin. Code § 8-107(4)(a), provides that "[i]t shall be an unlawful

discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee,

proprietor, manager, superintendent, agent or employee of any place or provider of public

accommodation . . . [b]ecause of any person's actual or perceived . . . disability . . . directly or

indirectly . . . [t]o refuse, withhold from or deny to such person the full and equal enjoyment, on

equal terms and conditions, of any of the accommodations, advantages, services, facilities or

privileges of the place or provider of public accommodation."  The statute further prohibits any

form of communication that services are not fully and equally available on account of disability.

167.    Persons include all "natural persons, proprietorships, partnerships, associations, group associations, organizations, governmental bodies or agencies, corporations [and] legal representatives . . . ."  N.Y.C. Admin. Code § 8-102(1).

168.    Pursuant to the NYCHRL, disability encompasses any impairment, regardless of whether the impairment substantially limits a person's ability to engage in major life activities. *See id.* § 8-102(16) (a) (defining disability as "any physical, medical, mental or psychological impairment, or a history or record of such impairment").

169.    The term "place or provider of public accommodation" encompasses "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold or otherwise made available."  N.Y.C. Admin. Code § 8-102(9).

170.    Transportation services that are provided to the public constitute a service, accommodation, advantage, or privilege that is offered to the general public within the meaning of N.Y.C. Admin. Code § 8-102(9).

171.    Defendant Uber is an "owner" or "proprietor" of Uber's transportation services.

172.    Defendant also acts as a "manager" of Uber's transportation services.

173.    Defendant is a "person" within N.Y.C. Admin. Code § 8-102(1).

174.    The services, accommodations, advantages and privileges that the Defendant makes available to the general public are such that Defendant, in its role as the system's owner, proprietor, and/or manager, violates N.Y.C. Admin. Code § 8-107(4)(a).

175.    The violations at hand are particularly grave in light of the "uniquely remedial" purpose behind the NYCHRL, which provides that each section must be "construed liberally for

the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed." N.Y.C. Admin. Code § 8-130.

176.    Accordingly, Defendant's conduct is subject to a much stricter standard than under state or federal law, and its liability under these provisions must be determined separately and independently from its liability under the disability anti-discrimination provisions of either state or federal civil rights law.

177.    As a direct and proximate result of Defendant's violations of the NYCHRL, Plaintiffs have been injured as set forth herein.

## SECOND CAUSE OF ACTION

Disparate Impact in Violation of the New York City Human Rights Law
(N.Y.C. Admin. Code § 8-107(17))

178.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs in this Complaint.

179.    Defendant's conduct also violates N.Y.C. Admin. Code § 8-107 (17), which states that "an unlawful discriminatory practice . . . is established . . . [when plaintiff] demonstrates that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter."

180.    By failing to operate this program so that it is readily accessible and usable by people who use wheelchairs when viewed in its entirety, Defendant has demonstrated a policy or practice that has a disproportionately negative impact on members of the proposed class, each of whom qualifies as a protected group under the provisions of the NYCHRL.

181.    In particular, as described above, Uber operates seven different services in New York (UberX, UberPOOL, UberXL, UberSUV, UberBLACK, UberCARSEAT, and UberWAV), but expressly limits accessible service to one, UberWAV.  Further, Uber's practice is to operate virtually all of its vehicles, 99.9%, in the inaccessible services, not in the accessible UberWAV service.  As a result, people with disabilities who need accessible vehicles are disproportionally provided with poorer service, including longer wait times and periodic complete lack of access to the Uber service.

### THIRD CAUSE OF ACTION

Disability Discrimination in Violation of Title III of the Americans with Disabilities Act, (42 U.S.C. § 12181 et seq.)

182.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs in this Complaint.

183.    Title III of the ADA prohibits discrimination on the basis of disability in the full and equal enjoyment of specified public transportation services provided by private entities primarily engaged in the business of transporting people and whose operations affect commerce. 42 U.S.C. § 12184.

184.    Public transportation is defined to mean "transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis." 42 U.S.C. § 12181(10).

185.    Defendant provide specified public transportation services within the meaning of the term under Title III on a regular and continuing basis.

186.    Title III of the ADA also prohibits discrimination on the basis of disability in the full and equal enjoyment of services provided by places of public accommodations. 42 U.S.C. § 12182.

187.    Defendant operate a public accommodation subject to Title III's nondiscrimination requirements. 42 U.S.C. §§ 12181, 12182.

188.    Defendant operate a "travel service" as defined by 42 U.S.C. § 12181.

189.    Defendant's operations affect interstate commerce, including by providing transportation across state lines, for example between New York City and New Jersey.

190.    By the acts alleged herein, Defendant have denied full and equal enjoyment of Defendant's services in violation of Title III of the ADA.

### THIRD CAUSE OF ACTION

Declaratory Relief on Behalf of Plaintiffs

191.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs in this Complaint.

192.    An actual controversy has arisen and now exists between the parties in that Plaintiffs contend, and are informed and believe that Defendant denies, that by failing to adopt policies and procedures that would provide people with mobility disabilities who require wheelchair accessible vehicles with full and equal enjoyment, on equal terms and conditions, of the services, facilities, privileges, advantages, and accommodations of Defendant's transportation system, it is discriminating against the class.

193.    Defendant fails to comply with applicable laws, including but not limited to the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*. and the Americans with Disabilities Act  42 U.S.C. § 12181 et seq.

194.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

WHEREFORE, Plaintiffs request relief as set forth below.

## VIII.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, on their own behalf and on behalf of the class, pray for judgment as follows:

195.    That this matter be certified as a class action with the class defined as set forth above, that Plaintiffs be appointed class representatives, and their attorneys be appointed class counsel.

196.    For an order and judgment enjoining Defendant from violating the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*., and the Americans with Disabilities Act  42 U.S.C. § 12181 et seq., and requiring Defendant to develop and implement a remedial plan to ensure full and equal access to its services for riders who require accessible transportation.

197.    A declaration that Defendant discriminates against persons with disabilities by failing to provide disabled riders, including Plaintiffs, with full and equal enjoyment, on equal terms and conditions, of the services, facilities, privileges, advantages, and accommodations of Uber's transportation system, in violation of New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*., and the Americans with Disabilities Act  42 U.S.C. § 12181 et seq.

198.    An order awarding Plaintiffs reasonable attorneys' fees and costs, as authorized by New York City Human Rights Law, N.Y.C. Admin. Code § 8-502 and the Americans with Disabilities Act, 42 U.S.C. § 12205.

-34-

199.    For such other and further relief as the Court deems just and proper.

Dated: November 2, 2017                    Respectfully submitted,
        New York, NY

                                           DISABILITY RIGHTS ADVOCATES

                                           _____
                                           Michelle Caiola
                                           Rebecca Serbin
                                           Maia Goodell
                                           DISABILITY RIGHTS ADVOCATES
                                           675 Third Avenue, Suite 2216
                                           New York, NY 10117
                                           Tel:  (212) 644-8644
                                           Fax:  (212) 644-8636

                                           Sidney Wolinsky (CA Bar No. 33716) *
                                           DISABILITY RIGHTS ADVOCATES
                                           2001 Center Street, 4th Floor
                                           Berkeley, CA 94704
                                           Tel:  (510) 665-8644
                                           Fax:  (510) 665-8511
                                           *Attorneys for Plaintiffs*

                                           *Admitted pro hac vice

-35-